IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ERIN WILSON, individually and on behalf of others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>COOKUNITY LLC,<br><br>*Defendant*. | Case No. 1:25-cv-03237-TRJ |

DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
TO COMPEL ARBITRATION AND TO STAY THE LITIGATION[1]

Plaintiff Erin Wilson alleges that Defendant CookUnity Inc.[2] violated the Telephone Consumer Protection Act ("TCPA") by sending her two text messages she did not want. The evidence shows that *someone* wanted Wilson to receive these messages. Someone visited CookUnity's website, completed several steps of CookUnity's sign-up process, and consented in writing to receive marketing text messages from CookUnity at Wilson's alleged phone number. In doing so, this person also agreed to submit any disputes against CookUnity to binding arbitration.

---

[1] CookUnity is contemporaneously filing a Motion to Dismiss, which need only be considered if its Motion to Compel Arbitration is denied.

[2] CookUnity Inc. is incorrectly identified in the Complaint as "CookUnity LLC."

Wilson has filed six other TCPA class actions this summer in which she claims that a company texted her without her consent.[3] It is theoretically possible that Wilson has simply gotten incredibly unlucky, and that some person, unknown to Wilson, is submitting her number in online consent forms for no apparent reason.

On the other hand, logic suggests that Wilson herself provided her consent on CookUnity's website or directed that it be provided on her behalf. A stranger has nothing to gain from taking the time to submit Wilson's number into CookUnity's system, which is only possible after completing several steps in CookUnity's sign-up process. Moreover, the timing of Wilson's opt-out request to CookUnity is consistent with someone bent on manufacturing TCPA claims.

The facts, as set forth herein, establish by a preponderance of the evidence that Wilson consented to receive texts from CookUnity and consented to arbitrate potential claims against CookUnity. To the extent it is unclear whether Wilson assented to the arbitration provision, limited discovery is appropriate to resolve the issue.

---

[3] *Wilson v. Tradercodes, LLC* (N.D. Ga. Case No. 1:25-cv-03211); *Wilson v. Quikaid Inc.* (N.D. Ga. Case No. 1:25-cv-03238); *Wilson v. Grocery Delivery E-Services USA* (N.D. Ga. Case No. 1:25-cv-03262); *Wilson v. Real Health Roots LLC* (N.D. Ga. Case No. 1:25-cv-03808); *Wilson v. McNamara Chiropractic* (N.D. Ga. Case No. 2:25-cv-00201); *Wilson v. PerPay, Inc.* (N.D. Ga. Case No. 1:25-cv-04588).

I.   **FACTUAL BACKGROUND**[4]

   A.   **CookUnity's Online Sign-Up Process.**

CookUnity is an innovative chef-to-consumer food delivery service. *See* Declaration of Armen Moskvitin ("Moskvitin Decl.") at ¶ 2. As part of CookUnity's marketing efforts, CookUnity sends text and SMS messages to individuals who provide prior express written consent to receive such messages through CookUnity's website. *Id.* ¶ 3. CookUnity does not send text or SMS messages unless it receives an individual's consent and phone number through its website. *Id.* ¶ 4. CookUnity does not purchase "leads" from any sources. *Id.* ¶ 5. All of its "leads" are people who visit the CookUnity website and provide their information and consent to be contacted. *Id.* CookUnity maintains an internal Do Not Call ("DNC") list. *Id.* ¶ 6.

Individuals who wish to receive text messages from CookUnity or purchase a CookUnity subscription may do so through CookUnity's website, CookUnity.com. *Id.* ¶ 7. The sign-up process involves several steps:

1.   The CookUnity website first takes visitors to a landing page, where they are prompted to enter their zip code. *Id.* ¶ 8.

---

[4] "District courts in this Circuit have regularly held that motions to compel arbitration are treated generally as motions to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Because these motions are factual attacks on the existence of subject matter jurisdiction, a reviewing court may consider evidence beyond the allegations in the complaint." *LeCann v. Aliera Companies, Inc.*, No. 1:20-CV-2429-AT, 2021 WL 2554942, at *19 (N.D. Ga. June 22, 2021) (citation modified) (collecting cases).

3

2. Once a visitor enters their zip code, they are prompted to enter the number of weekly meals they would like to receive. *Id.* ¶ 9.

3. The visitor is then prompted to create an account or proceed through an existing account with CookUnity, Google, Facebook, or Apple. *Id.* ¶ 10.

4. After either logging in or creating an account with an email and password, the visitor is prompted to select the first week's meals. *Id.* ¶ 11.

5. The visitor then inputs a delivery address, contact information, and delivery window. *Id.* ¶ 13.

6. Finally, the visitor is prompted to enter payment information. *Id.* ¶ 19.

At the fifth step, and after inputting all information but payment information, visitors are presented with a check box, where they may "agree to receive texts and updates on the latest product launches, exclusive offers, and more." *Id.* ¶ 15. Immediately below that check box is the consent language, which explicitly states, "I agree to receive recurring automated marketing text messages (e.g. cart reminders) at the phone number provided. Consent is not a condition to purchase. Msg & data rates may apply. Msg frequency varies. Reply HELP for help and STOP to cancel. View our <u>Terms of Service</u> and <u>Privacy Policy</u>." *Id.* The underlined "Terms of Service" and "Privacy Policy" contain hyperlinks to CookUnity's operative terms of service and privacy policy. *Id.* ¶ 16.

**B.     Someone Consents to Receive Text Messages at Wilson's Number.**

On March 28, 2025, a person visited the CookUnity website and completed five of the six steps in the sign-up process. *Id.* ¶ 21. At the "Delivery Address" page, the visitor entered the name "Pulin Sheth," a delivery address in Duluth, GA, and Wilson's alleged phone number. *Id.* ¶ 22. The visitor also selected the check box stating, "I agree to receive texts and updates on the latest product launches, exclusive offers, and more!" *Id.* They then clicked the "Next" button immediately beneath the hyperlinked "Terms of Service and Privacy Policy." *Id.* ¶ 24. After proceeding to the final "Confirm Order" page, the visitor left the sign-up process without completing the order. *Id.*

**C.     CookUnity's Then-Operative Terms and Conditions of Service.**

As of March 28, 2025, CookUnity's operative Terms and Conditions of Service provided:

> By using the CookUnity Platform, you acknowledge that you have read, understand, and expressly agree to be legally bound by these terms and conditions. IF YOU DO NOT AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THESE TERMS AND CONDITIONS, PLEASE DO NOT USE OR REGISTER FOR THE SERVICES PROVIDED ON THE COOKUNITY PLATFORM.

*See* Terms and Conditions at p. 1, Moskvitin Decl. Ex. A.

The arbitration provision is titled "**Dispute Resolution & Binding Arbitration**" in 27-point bold font. *Id.* at p. 37. At the outset, "PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN THIS SECTION

5

("ARBITRATION AGREEMENT") CAREFULLY BECAUSE IT REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH COOKUNITY AND LIMITS THE MANNER IN WHICH YOU CAN SEEK RELIEF FROM US." *Id.* It provides:

> YOU AND COOKUNITY HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. You and CookUnity are instead electing that all disputes, claims, or requests for relief shall be resolved by arbitration under this Arbitration Agreement, except as specified above.

*Id.* at 38.

It further states that "any proceedings to resolve or arbitrate any dispute will be conducted solely on an individual basis. Neither you nor CookUnity will seek to have any dispute heard as a class action . . . . You agree not to act in the capacity of a named plaintiff, class representative, opt-in, class member or otherwise participate in any capacity in a class or collective proceeding." *Id.*

## II.  LEGAL STANDARD

### A.  Motion to Compel Arbitration.

The FAA requires courts to "'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013). When a party who has agreed to arbitrate a dispute instead brings a lawsuit, the defendant may move to stay the litigation, 9 U.S.C. § 3, and compel arbitration, 9 U.S.C. § 4.

"Before referring a dispute to an arbitrator," a court must "determine[] whether a valid arbitration agreement exists." *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1346 (11th Cir. 2025). This "threshold question . . . is simply a matter of contract." *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (internal quotations omitted). "[S]tate law generally governs whether an enforceable contract or agreement to arbitrate exists." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005).

"Once a party moves to compel arbitration, 9 U.S.C. § 4 provides the governing procedure," which "mirrors summary judgment." *Lamonaco*, 141 F.4th at 1347. "If the existence of the agreement is not genuinely disputed, the court must compel arbitration. But if the opposing party raises a genuine dispute of material fact as to contract formation, the court must hold a summary trial." *Id.* (citation omitted).

**B.   Georgia Contract Law.**

"To constitute a valid contract" under Georgia law, "there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13–3–1. "The element of assent requires (a) a meeting of the minds (b) on the essential terms of the contract. The existence and terms of a contract must be proven by a preponderance of the evidence." *Bazemore*, 827 F.3d at 1330 (citation modified).

7

A party cannot avoid a contractual obligation by "undertak[ing] [the] obligation in a fictitious or trade name." *See Am. Exp. Travel Related Servs. Co., Inc. v. Berlye*, 414 S.E.2d 499, 501 (Ga. Ct. App. 1991). "[A]n undertaking by an individual in a fictitious name is the obligation of the individual." *Courtland Hotel, LLC v. Salzer*, 767 S.E.2d 750, 752 (Ga. Ct. App. 2014).

C. **Limited Discovery on Arbitrability**

"The Court has the discretion to allow limited discovery on the issue of arbitrability." *Chamlee v. Jonesboro Nursing & Rehab. Ctr., LLC*, No. 1:18-cv-05899-ELR, 2019 WL 6042273, at *4 (N.D. Ga. Aug. 14, 2019) (collecting cases). Courts have ordered such discovery where the parties dispute whether the plaintiff assented to the arbitration agreement. *See, e.g.*, *Reed v. Eastside Med. Ctr., LLC*, No. 1:19-cv-03967-SDG, 2020 WL 5659436, at *7 (N.D. Ga. Sept. 23, 2020) ("[T]he Court finds that limited discovery and further briefing is necessary concerning whether Plaintiff assented to the Arbitration Agreement. Only then will the Court be able to determine whether there exists a genuine issue of material fact on this question that renders a trial of the issue unnecessary."); *Aguilera v. 720 Ocean Drive, LLC*, No. 23-21746-CIV-ALTONAGA/Damian, 2023 WL 11814858, at *2 (S.D. Fla. June 6, 2023) (ordering discovery where "the making of the arbitration agreement has been put 'in issue'"); *Mitchell v. Precision Motor Cars Inc.*, No. 8:17-

cv-376-T-24AAS, 2017 WL 1361528, at *4–5 (M.D. Fla. Apr. 14, 2017) (ordering "discovery limited to issues related to the existence of an arbitration agreement").

"[C]ourts have routinely stayed discovery into the underlying merits of the case when a motion to compel arbitration has been filed in good faith." *Lacroix v. Lejeune Auto Wholesale, Inc.*, No. 20-21469-Civ-WILLIAMS/TORRES, 2020 WL 6059765, at *3 (S.D. Fla. Oct. 14, 2020) (collecting cases); *see also Larsen v. J.P. Morgan Chase Bank, N.A.*, 438 F. App'x 894, 895 (11th Cir. 2011) (limiting discovery on remand "to issues bearing significantly on the arbitrability of this dispute until the question of arbitrability has been decided."). After all, "[d]eferring a determination on arbitrability under after discovery is completed would defeat some of the very purposes of arbitration, that is, the greater efficiency and cost-effectiveness that it offers." *Ivy v. Ecolab, Inc.*, No. 1:19-CV-5476-JPB-JSA, 2020 WL 10055326, at *9 (N.D. Ga. Apr. 20, 2020), *report and recommendation adopted,* No. 1:19-CV-5476-JPB, 2020 WL 10054682 (N.D. Ga. May 12, 2020).

### III.  ARGUMENT

"According to Occam's Razor, all things being equal, the simplest explanation requiring the fewest assumptions tends to be the correct one." *Doe 1 v. Francis*, No. 5:03CV260/RS, 2006 WL 8444030, at *6 (N.D. Fla. May 8, 2006) (weighing competing explanations for the timing of subpoenas). That principle holds true here. The evidence shows that someone (1) proceeded through five of the six steps of

CookUnity's online sign-up process; (2) entered the name "Pulin Sheth," a delivery address in Duluth, GA, and with Wilson's alleged phone number; (3) consented to receive text messages at Wilson's number; (4) agreed to CookUnity's Terms of Service; and (5) left CookUnity's website almost immediately after consenting to receive text messages and before entering payment information.

The simplest explanation is that Wilson herself visited the CookUnity website and entered all of this information. When faced with a similar "someone else agreed to arbitration using my information" argument, courts have noted someone else would have no reason to act in such a way. *See, e.g.*, *Uszak v. AT & T, Inc.*, No. 1:14CV2800, 2015 WL 13037500, at *6 (N.D. Ohio Oct. 6, 2015) ("There is no evidence another employee reviewed the arbitration agreement and clicked 'Review Completed' on behalf of Uszak. . . . There was no benefit to any employee to do so.").

This is not Wilson's only TCPA lawsuit. This summer, Wilson filed six other TCPA class action complaints: *Wilson v. Tradercodes, LLC* (N.D. Ga. Case No. 1:25-cv-03211); *Wilson v. Quikaid Inc.* (N.D. Ga. Case No. 1:25-cv-03238); *Wilson v. Grocery Delivery E-Services USA* (N.D. Ga. Case No. 1:25-cv-03262); *Wilson v. Real Health Roots LLC* (N.D. Ga. Case No. 1:25-cv-03808); *Wilson v. McNamara Chiropractic* (N.D. Ga. Case No. 2:25-cv-00201); *Wilson v. PerPay, Inc.* (N.D. Ga.

Case No. 1:25-cv-04588).[5] These complaints follow a similar pattern: Wilson receives an allegedly unwanted text message. She does not respond. Once she receives a subsequent text message she typically responds shortly thereafter with an opt-out message, as she did here. That is no coincidence, as her theory of liability is that CookUnity (and other defendants) violated the TCPA by sending more than one text message in a 12-month period while her number was registered on the DNC. (Compl. ¶¶ 51–59, Doc. 1.)

Despite complaining that these text messages are "a private nuisance," (*e.g.*, Compl. ¶ 22, Doc. 1), Wilson's complaints demonstrate that she opts out after she has received multiple texts. *See id*. ¶ 16, *Wilson v. Tradercodes, LLC* (N.D. Ga. Case No. 1:25-cv-3211) (opt out after second text); Doc. 1 at ¶ 16, *Wilson v. Quikaid Inc.* (N.D. Ga. Case No. 1:25-cv-3238) (opt out after second text); Doc. 1 at ¶ 16, *Wilson v. Grocery Delivery E-Services USA* (N.D. Ga. Case No. 1:25-cv-3262) (opt out after third text); Doc. 1 at ¶ 16, *Wilson v. Real Health Roots LLC* (N.D. Ga. Case No. 1:25-cv-3808) (opt out after second text); Doc. 1 at ¶ 16, *Wilson v. McNamara Chiropractic* (N.D. Ga. Case No. 2:25-cv-201) (opt out after third text); Doc. 1 at ¶ 16, *Wilson v. PerPay, Inc.* (N.D. Ga. Case No. 1:25-cv-4588) (no opt out). This calculated behavior is more consistent with someone who is trying to create TCPA

---

[5] The Court may consider the complaints with without converting this motion into a motion for summary judgment. *See, e.g.*, *Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53 (11th Cir. 2006).

claims than someone annoyed that their number has been submitted to various online consent forms.

If, as the evidence suggests, Wilson submitted her number on CookUnity's website, then she is also bound by the arbitration provisions in CookUnity's Terms of Service. *See Rahim v. Chime Fin., Inc.*, No. 1:22-cv-03209-WMR, 2022 WL 18459836, at *2 (N.D. Ga. Nov. 14, 2022) ("Contracts where a party accepts additional terms and conditions in an internet transaction are often referred to as 'clickwrap agreements.' Georgia courts have generally ruled that arbitration clauses contained in such agreements are enforceable.") (citations omitted).

The CookUnity Terms of Service are a "clickwrap agreement" because website visitors must click a button to affirmatively accept the Terms of Service before the visitor can proceed in the sign-up process. *See id.* Courts applying Georgia law enforce clickwrap agreements where, as here, website visitors click to accept the Terms after having notice of and an opportunity to review them. *See, e.g.*, *id.*; *Newton v. Experian Info. Sols., Inc.*, No. 24-12398, 2025 WL 2102084, at *3 (11th Cir. July 28, 2025) ("Under Georgia law, [the plaintiff] could be bound by the hyperlinked terms of use when enrolling in a service, regardless of whether she actually clicked on them."); *Hanson v. Experian Info. Sols., Inc.*, No. 1:23-cv-4564-MHC-CMS, 2024 WL 3509482, at *11 (N.D. Ga. July 22, 2024).

The process by which visitors to CookUnity's website accept the Terms of Service fits squarely within this authority. The sign-up process has visitors first enter their zip code and number of meals they wish to receive from CookUnity. Moskvitin Decl. ¶¶ 8–9. Visitors are then prompted to create an account, *id.* ¶ 10, and select their first week's meals, *id.* ¶ 11. The visitor then enters their delivery address and contact information. *Id.* ¶ 13. Only after this point could a visitor consent to receive text messages by checking a box to "agree to receive texts and updates on the latest product launches, exclusive offers, and more." *Id.* ¶¶ 14–15. Visitors are also directed to "view [CookUnity's] Terms of Service" before clicking next to the payment page. *Id.* ¶ 15. After clicking "next", visitors are then prompted to enter payment information and confirm their order. *Id.* ¶ 19.

The hyperlinked terms put Wilson "on notice that an agreement exist[ed]" and gave her "the opportunity to review the terms of that agreement and to consent." *See Mason v. Midland Funding LLC*, 815 F. App'x 320, 322 (11th Cir. 2020). Wilson consented to the terms by submitting her information, and her use of a fictitious name does not change this analysis. *See Courtland Hotel*, 767 S.E.2d at 752. Any other conclusion is simply implausible under the circumstances and the Court should enforce the arbitration provision.

## IV. CONCLUSION

The evidence indicates that Wilson consented to arbitrate the claims she alleges in her Complaint. The FAA dictates that the Court should stay this litigation and compel arbitration. *See* 9 U.S.C. §§ 3, 4. Alternatively, to avoid "defeat[ing] some of the very purposes of arbitration," the Court should permit limited discovery on the issue of arbitrability. *See Ivy*, 2020 WL 10055326, at *9.

Dated: August 22, 2025
      New York, New York

Respectfully submitted,

**EVERSHEDS SUTHERLAND (US) LLP**

*/s/ Francis X. Nolan, IV*
Francis X. Nolan, IV (*pro hac vice*)
1114 Avenue of the Americas
The Grace Building 40th Floor
New York, New York 10036
Telephone: (212) 389-5083
Facsimile:  (212) 389-5099
franknolan@eversheds-sutherland.com

Ian N. Jones (Bar No. 437690)
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia 30309
Telephone: (404) 853-8051
Facsimile: (404) 853-8806
ianjones@eversheds-sutherland.com

***Counsel for Defendant***

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(C) in 14-point Times New Roman typeface.

Dated: August 22, 2025
    New York, New York

*s/ Francis X. Nolan, IV*
Francis X. Nolan, IV (*pro hac vice*)
