UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHET MICHAEL WILSON, *individually and on behalf of all others similarly situated,*

Plaintiff,

-v-

BETTER MORTGAGE CORP.,

Defendant.

---

25 Civ. 5503 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This putative class action arises from alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.  Plaintiff Chet Michael Wilson claims that defendant Better Mortgage Corp. ("Better Mortgage"), a mortgage lending company, sent unsolicited text messages to his personal cellphone number to induce him to apply for a home loan, despite Wilson's number being listed on the National Do-Not-Call Registry ("DNCR").  Wilson brings a single claim under § 227(c)(5) of the TCPA and 47 C.F.R. § 64.1200(c).

Better Mortgage now moves to dismiss Wilson's Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, to strike certain class-related allegations.  For the following reasons, the Court denies the motion.

I.    **Factual Background**[1]

A.    **The Parties**

---

[1] The Court draws the facts in this decision from the Amended Complaint ("AC").  Dkt. 16; *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  In resolving Better Mortgage's motion to dismiss

Wilson is a natural person.[2]  Dkt. 16 ("AC") ¶ 6.

Better Mortgage Corp. is a mortgage lending company in this District.  *Id.* ¶¶ 7, 36.

### B.    Text Messages Sent by Better Mortgage to Wilson's Personal Cellphone Number

Since at least 2020, Wilson has used the same cellphone number (the "cellphone number").  *Id.* ¶¶ 8–12.  He has used this cellphone number only for personal purposes, such as communicating with friends and family.  *Id.* ¶¶ 12–13.  He is not reimbursed by any business for the cellphone plan for this number.  *Id.* ¶ 14.

Wilson had registered the cellphone number on the DNCR for at least 30 days before receiving the text messages at issue.[3]  *Id.* ¶ 15.

In 2022, Better Mortgage delivered, or caused to be delivered, text messages to Wilson's cellphone number.  *Id.* ¶ 17.  The AC includes screenshots of the following two examples.

On April 2, 2022, a phone number (ending -8472) sent the following text message:

> Hi Joseph, this is Chloe from Better Mortgage.  I see that you are only a few steps away from getting pre-approved.  Looks like the next step for you is to provide information on your assets.  How can I help?
>
> NMLS #330511.  Reply STOP to end.

*Id.* ¶ 18.

Two days later, on April 4, 2022, a different phone number (ending -6120) sent:

> Hi Joseph!  This is Joshua with Better Mortgage.  Congrats on getting pre-approved for a home loan!  I just tried giving you a call to discuss the recent application and

---

under Rule 12(b)(6), the Court accepts all factual allegations in the AC as true and draws all reasonable inferences in Wilson's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The AC does not allege Wilson's residency or other identifying details.  *See* AC ¶ 6.

[3] The AC does not state when Wilson registered his cellphone number on the DCNR.  *See* AC ¶ 15.

to learn more about your home buying journey.  Let us know if there is a better time
to connect!  Looking forward to speaking soon!

*Id.*

In the April 2 text message, "NMLS #330511" referred to Better Mortgage's uniquely
assigned, publicly searchable number in the Nationwide Multistate Licensing System ("NMLS").
*Id.* ¶¶ 22–24.  Better Mortgage is required by law to include its NMLS identifier in consumer
advertisements or other communications related to mortgage loans.  *Id.*

Wilson has never applied for a loan with Better Mortgage or provided his financial
information to it.  *Id.* ¶ 31.  He did not consent to receiving text messages from Better Mortgage
to his cellphone number; request any information or promotional materials from Better
Mortgage; or have a business relationship with it.  *Id.* ¶¶ 45–47.  Wilson does not know the
identity of "Joseph," the individual to whom the text messages were ostensibly addressed.  *Id.*
¶ 35.

### C.    Better Mortgage's Advertising and Business Models

The AC alleges that Better Mortgage's advertising and business models function as
follows.  Better Mortgage generates revenue by originating mortgage loans for consumers.  *Id.*
¶¶ 36–37.  To do so, it engages in pretextual text messaging campaigns, as reflected in the two
text messages quoted above.  *Id.* ¶¶ 38–43.  These text messages (*e.g.*, to "Joseph") are sent *en
masse* to potential borrowers to induce them to engage with Better Mortgage and eventually to
apply for home loans with it.  *Id.*  Better Mortgage only earns revenue when consumers, such as
those attracted through these text message campaigns, actually apply for and close on loans.
These give rise to origination fees, interest, and servicing rights.  *Id.*

**D.      Wilson's Claim**

The AC asserts that Better Mortgage deliberately targeted Wilson's cellphone number, in knowing disregard of its obligations not to solicit numbers on the DNCR.  *Id.* ¶¶ 49–55.  The fact that it addressed the text messages to "Joseph" instead of Wilson, the AC alleges, shows that Better Mortgage knew it had neither Wilson's consent to send the messages nor a preexisting business relationship with him.  *Id.* ¶ 54.

Wilson brings a single claim against Better Mortgage under § 227(c)(5).  *Id.* ¶¶ 89–97.  That provision creates a private right of action for any person who has "received more than one telephone call" within 12 months by the same entity in violation of the DNCR regulations issued under the provision.  47 U.S.C. § 227(c); *see also* 47 C.F.R. § 64.1200(c).

The AC also asserts that Wilson is an adequate representative of the following class:

> All persons throughout the United States (1) who did not provide their telephone number to Better Mortgage Corp., (2) to whom Better Mortgage Corp. delivered, or caused to be delivered, more than one voice message or text message within a 12-month period, promoting Better Mortgage Corp. goods or services, (3) where the person's residential telephone number had been registered with the [DNCR] for at least thirty days before Better Mortgage Corp. delivered, or caused to be delivered, at least two of the voice messages or text messages within the 12-month period, (4) within four years preceding the date of this complaint and through the date of class certification.

AC ¶ 61.

Wilson seeks money damages, including treble damages for willful or knowing conduct.  *Id.* at 12–13.  He also seeks an injunction requiring Better Mortgage to cease conduct violating the TCPA.  *Id.*

**II.      Procedural History**

On July 2, 2025, Wilson initiated this action.  Dkt. 1.  On August 28, 2025, Better Mortgage moved to dismiss the original complaint, Dkt. 13, and filed a supporting memorandum

4

of law, Dkt. 14.  On August 29, 2025, the Court directed Wilson to amend his complaint or oppose the motion to dismiss by September 18, 2025.  Dkt. 15.

Wilson timely filed the AC.  Dkt. 16.  On September 23, 2025, Better Mortgage filed a new motion to dismiss, Dkt. 17, and an accompanying memorandum of law, Dkt. 18 ("MTD").  On October 2, 2025, Wilson opposed.  Dkt. 22 ("Opp'n").  On October 23, 2025, Better Mortgage replied.  Dkt. 25 ("Reply").

On November 4, 2025, the Court held an initial conference and stayed discovery, pending resolution of the MTD.[4]  Dkt. 28.

On November 5, 2025, Better Mortgage filed a notice of supplemental authority, Dkt. 29 ("Better Mortgage Supp."); Wilson responded the next day, Dkt. 30.  On November 13, 2025, Wilson filed another notice of supplemental authority, Dkt. 32 ("Wilson Supp."); on November 21, 2025, Better Mortgage responded, Dkt. 33.

## III.  Discussion

Better Mortgage moves to dismiss the AC under Rule 12(b)(6) for failure to state a claim on two main grounds: (1) § 227(c) does not apply to text messages; and (2) the AC does not adequately plead that the text messages Wilson received were "telephone solicitations" under the TCPA.  Better Mortgage also seeks dismissal under Rule 12(b)(6) of the AC's prayer for treble damages, arguing that the facts pled do not allege a willful or knowing violation of the TCPA.  Last, as an alternative to dismissal, Better Mortgage seeks to strike the AC's allegations related to class relief, arguing that common issues of fact and law were insufficiently pled.  MTD at 7–9.

---

[4] In staying discovery, the Court directed Better Mortgage to file an affidavit describing its document preservation measures.  Dkt. 28.  The stay was without prejudice to a future application by Wilson to lift it if such measures were insufficient.  *Id.*  On November 12, 2025, Better Mortgage filed the affidavit.  Dkt. 31.  To date, Wilson has not moved to lift the stay.

None of these arguments has merit.  The Court addresses each in turn.

### A.    Better Mortgage's Motion to Dismiss

#### 1.    Applicable Legal Standard Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  In resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

#### 2.    The TCPA and its Implementing Regulations

In 1991, Congress enacted the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology" by telemarketers. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012).  It found that automated telemarketing directed at residential phone numbers constituted an "intrusive invasion of privacy." *Id.* at 372 (quoting Pub. L. No. 102-243 § 2(5), 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227)).  Federal law should prohibit that harm, Congress found, because telemarketers could otherwise evade state-law bans by operating interstate. *Id.*

The TCPA has two main provisions.  Section 227(b) is titled "Restrictions on use of automated telephone equipment."  47 U.S.C. § 227(b).  It prohibits, *inter alia*, making "any call . . . using any automatic telephone dialing system or an artificial or prerecorded voice" to certain types of phone numbers, including those assigned to a "cellular telephone service."  *Id.* § 227(b)(1)(A).  It bars initiating "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message."  *Id.* § 227(b)(1)(B).  It also prohibits sending an "unsolicited advertisement" between "any telephone facsimile machine[s]."  *Id.* § 227(b)(1)(C).  These prohibitions do not apply to calls made under certain circumstances, such as in emergencies, with the recipient's prior express consent, and where an established business relationship exists.  *Id.* § 227(b)(1)(A)–(C).  Section 227(b) directed the Federal Communications Commission ("FCC") to issue implementing regulations, *id.* § 227(b)(2), and created a private right of action for violations of the provision or such regulations, *id.* § 227(b)(3).

Unlike § 227(b), which focuses on restricting the use of automatic telephone equipment, § 227(c) is more broadly titled "Protection of subscriber privacy rights."  *Id.* § 227(c).  It directed the FCC to conduct a rulemaking proceeding "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  *Id.* § 227(c)(1).  "Telephone solicitation" is defined throughout § 227 as the "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person," subject to certain exceptions.  *Id.* § 227(a)(4).  Section 227(c) also authorized, but did not require, the FCC to issue regulations to "require the establishment and operation of a single national database" of residential telephone numbers of persons who did not want to receive telephone solicitations.  *Id.* § 227(c)(3).  If the

7

FCC chose to require such a database, the regulations governing it must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database." *Id.* § 227(c)(3)(F). Section 227(c) also created a private right of action for any person who receives "more than one telephone call within any 12-month period by or on behalf of the same entity" in violations of the regulations prescribed under this provision. *Id.* § 227(c)(5).

In response, the FCC issued regulations under § 227(c) establishing the DNCR. These regulations prohibit, *inter alia*, any "person or entity" from initiating "any telephone solicitation" to a "residential telephone subscriber" who has registered his or her number on the DNCR. 47 C.F.R. § 64.1200(c)(2).

### 3.    Whether § 227(c) of the TCPA Applies to Text Messages

Wilson sues under § 227(c)(5), which creates a private right of action for any person who received more than one "telephone call" within a 12-month period from the same entity in violation of the DNCR regulations.

Better Mortgage argues that the AC fails to state a claim because it alleges only that Wilson received unsolicited text messages—to which, it contends, § 227(c)'s private right of action for unsolicited "telephone call[s]" does not apply.

The Court holds, in accord with a growing consensus of case law, that § 227(c) of the TCPA applies to text messages for multiple reasons, developed below. In brief, although modern parlance tends to distinguish between phone calls and text messages, the meaning of "telephone call" in 1991—when the TCPA was enacted—was broad enough to encompass text messages. The overwhelming weight of authority holds that § 227(b), a neighboring section using the same term, covers text messages, and the meaning of "telephone call" in § 227(c) is at

least as broad as that in § 227(b). The FCC has also interpreted both § 227(b) and (c) to apply to text messages.

*a.*     *The Text of § 227(c)*

The "starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 56 (1987) (citation omitted). Courts interpret statutory language in accord with the "ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("[E]very statute's meaning is fixed at the time of enactment." (citation omitted)); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").

The ordinary public meaning of "telephone call" when the TCPA was enacted in 1991 was a communication made by telephone. *See, e.g.*, Webster's Ninth New Collegiate Dictionary 197 (1989) ("the act of calling on the telephone," *i.e.*, "to get or try to get into communication by telephone," or "to deliver (a message) by telephone"); Webster's Third New International Dictionary 318 (1993) ("to communicate with or try to get into communication with a person by telephone"); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 (9th Cir. 2009) (same). The contemporary definition of "telephone call" was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone.

Text messages fit easily within that broad definition. It is undisputed that text messages are communications sent by telephone. They therefore fall within the ordinary public meaning of "telephone call" as that term was used when the TCPA was enacted. *See, e.g.*, *Mujahid v.*

9

*Newity, LLC*, No. 25 Civ. 8012, 2025 WL 3140725, at *2 (N.D. Ill. Nov. 10, 2025) (so holding);

*Wilson v. MEDVIDI Inc.*, No. 25 Civ. 3996, 2025 WL 2856295, at *2 (N.D. Cal. Oct. 7, 2025)

(same)[5]; *Pariseau v. Built USA, LLC*, 619 F. Supp. 3d 1203, 1206–07 (M.D. Fla. 2022) (same).

Better Mortgage's counterarguments are unpersuasive. First, it argues that the TCPA's

reference to "telephone calls" cannot apply to text messages because such technology did not

exist when Congress passed the statute. MTD at 9; Reply at 6. To be sure, the first text message

was sent in late 1992, nearly a year after the TCPA's enactment. MTD at 9; *Keating v.

Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). But the fact that text messages

had not yet been invented when Congress wrote the TCPA does not foreclose that it intended for

the statute to cover future technology. To the contrary, the Second Circuit has recognized, as to

§ 227(b), that "the nuisance and privacy invasion attendant on spam texts are the very harms

with which Congress was concerned when enacting the TCPA"—notwithstanding that that mode

of telephone communication did not yet exist. *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85,

88 (2d Cir. 2019). That text messages did not exist when Congress enacted the TCPA also

explains why Congress did not refer specifically to that technology, instead using the broader

term "telephone call." *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("As we have

said before, the fact that a statute can be 'applied in situations not expressly anticipated by

Congress does not demonstrate ambiguity. It demonstrates breadth.'" (quoting *Sedima, S.P.R.L.

v. Imrex Co.*, 473 U.S. 479, 499 (1985))).

Better Mortgage next argues that "telephone call" cannot encompass text messages

because no one today would think of a text message as a telephone call. *E.g.*, MTD at 15. But

---

[5] The plaintiff in *MEDVIDI* has the same full name as plaintiff Wilson, and appears to be the
same party.

that improperly substitutes the present-day meaning of "telephone call" for the ordinary public meaning of that term when § 227(c) was enacted in 1991.  In the three-plus decades since then, text messaging has become ubiquitous.  That technological change gave rise to new vocabulary: "to text" is today a widely used verb, meaning "to send a text message from one cell phone to another."  Merriam-Webster's Collegiate Dictionary 1293 (11th ed. 2020).  As a result, English speakers today tend to distinguish between "text messages" and "telephone calls."  In other words, the public meaning of "telephone call" was broader in 1991 than today.  But that linguistic development is of no consequence here because "every statute's meaning is fixed at the time of enactment."  *Loper Bright*, 603 U.S. at 400 (citation omitted).  The TCPA-era definition of "telephone call," as captured by contemporary dictionaries, controls the statute's construction. And that term's broad definition—a communication made by telephone—easily encompasses text messages.

b.      *Relevant Statutory Context of § 227(c)*

The context of § 227(c) also strongly supports that the provision applies to text messages.

Statutes must be read as a whole, not as a collection of isolated provisions.  *See Territory of Guam v. United States*, 593 U.S. 310, 316 (2021); *King v. Burwell*, 576 U.S. 473, 486 (2015). Courts therefore interpret statutory terms "in their context and with a view to their place in the overall statutory scheme."  *King*, 576 U.S. at 486 (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

Section 227(b) of the TCPA uses the same term as § 227(c): "telephone call."  And numerous federal courts of appeals have held that § 227(b) applies to text messages, or assumed so without deciding the issue.  None has construed either provision not to cover text messages. *See, e.g.*, *Breda v. Cellco P'ship*, 934 F.3d 1, 4 n.1 (1st Cir. 2019) ("The TCPA also applies to

11

. . . text messages."); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 117 n.3 (3d Cir. 2018) ("Although the text of the statute refers only to 'calls,' we have held that, under the TCPA, that term encompasses text messages." (citing *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013))); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 688 (5th Cir. 2021) ("Robocalls and robotexts are nuisances.  Congress banned them in the [TCPA]."); *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020) ("Text messages to a cellular telephone qualify as a 'call' within the meaning of the statute."); *see also Satterfield*, 569 F.3d at 954 (deferring to FCC's reasonable interpretation of the TCPA "to hold that a text message is a 'call'")[6]; *Drazen v. Pinto*, 74 F.4th 1336, 1346 (11th Cir. 2023) (holding, under § 227(b), that receipt of one unwanted text message caused concrete injury sufficient for Article III standing).

The Second Circuit has also repeatedly treated § 227(b)'s reference to "telephone call[s]" as covering text messages.[7]  In *Melito, supra*, the Circuit addressed whether plaintiffs' receipt of unsolicited text messages, absent any other injury, was sufficient to demonstrate injury-in-fact to confer Article III standing.  923 F.3d at 88.  Plaintiffs had filed a putative class action under § 227(b), alleging injury based on the unwanted texts.  *Id.*  The Circuit held injury-in-fact adequately pled.  *Id.*  It reasoned, in part: "[T]ext messages, while different in some respects from the receipt of calls or faxes specifically mentioned in the TCPA, present the same 'nuisance

---

[6] Although *Satterfield* relied in part on *Chevron* deference, it remains good law, notwithstanding *Chevron*'s later overruling.  *See Loper Bright*, 603 U.S. at 412 ("Mere reliance on *Chevron* . . . is not enough to justify overruling a statutory precedent.").

[7] District courts in this Circuit have uniformly assumed, without deciding, that § 227(c) applies to text messages.  *See, e.g.*, *Hulett v. Eyebuydirect, Inc.*, No. 24 Civ. 996, 2025 WL 1677071, at *2 n.2 (N.D.N.Y. June 13, 2025); *Frederick v. Wally Health, Inc.*, No. 23 Civ. 10363, 2025 WL 1344346, at *2, 5 (S.D.N.Y. Apr. 25, 2025), *report and recommendation adopted*, 2025 WL 1518271 (S.D.N.Y. May 28, 2025); *Silva v. Seven Rock Life Corp.*, No. 23 Civ. 6407, 2024 WL 3228437, at *5 (E.D.N.Y. June 28, 2024).  None has held otherwise.

and privacy invasion' envisioned by Congress when it enacted the TCPA." *Id.* (quoting Pub. L. No. 102-243 §§ 5, 12).[8]

The Circuit again assumed that § 227(b) applies to text messages when it interpreted the meaning of the term "automatic telephone dialing system" ("ATDS"), as used in that provision. *Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 280–81, 290 (2d Cir. 2020), *cert. granted, judgment vacated*, 141 S. Ct. 2509 (2021), *and abrogated by Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021).[9] In *La Boom Disco*, the plaintiff claimed that the defendant had sent him hundreds of unsolicited text messages using an ATDS, as required for liability under § 227(b). *Id.* at 281. In holding that the defendant had used an ATDS, the Circuit assumed, without deciding, that § 227(b) applies to text messages. *Id.* (stating that if defendant used an ATDS to send the alleged text messages, then it was liable to plaintiff under the TCPA).

Finally, the Supreme Court has repeatedly assumed, without resolving, that § 227(b) applies to text messages. In *Campbell-Ewald Co. v. Gomez*, it stated: "[I]t is undisputed" that a "text message . . . qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." 577 U.S. 153, 156 (2016). And in *Duguid*, the Supreme Court noted that neither party had disputed that the

---

[8] The Circuit also noted that the FCC had issued regulations interpreting the TCPA to cover text messages. *Melito*, 923 F.3d at 88 (citing *In the Matter of Rules and Reguls. Implementing Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 14014, 14115 (July 3, 2003)). The Circuit did not rely on the FCC's interpretation in its decision. *See id.* at 93 n.5.

[9] The Circuit's holding that the text messaging technology at issue constituted an ATDS was vacated and remanded in light of *Duguid*, in which the Supreme Court interpreted the same term. *See Duran*, 141 S. Ct. at 2509. Because *La Boom Disco* therefore lacks precedential force, the Court relies on it only to the extent that its reasoning is persuasive and reflects the consistency of the Circuit's construction of the TCPA over time. *See O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975) (vacatur "deprives [] court's opinion of precedential effect"); *In re Bernard L. Madoff Inv. Secs. LLC*, 721 F.3d 54, 68 (2d Cir. 2013) (same).

TCPA extended to unsolicited text messages.  It "therefore assume[d] that it does without considering or resolving that issue."  *Duguid*, 592 U.S. at 400 n.2.

The weight of the above authority concerning § 227(b) strongly suggests that § 227(c)'s parallel usage of "telephone call[s]" applies to text messages.  "[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."  *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 372–73 (2d Cir. 2022) (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005)); *see also Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning.").  Here, nothing indicates that Congress intended for the same term in § 227(c) to cover fewer modes of telephonic communications than that in § 227(b).

To the contrary, to the extent Better Mortgage argues that there is any difference between the meaning of "telephone call" as used in § 227(b) and (c), the statute's text and context suggest that § 227(c), if anything, was intended to reach broader telephonic communications than § 227(b).  Section 227(b) is titled "Restrictions on use of automated telephone equipment," and accordingly prohibits the use of any ATDS or "artificial or prerecorded voice" to send spam communications.  47 U.S.C. § 227(b)(1)(A).  By contrast, § 227(c) is titled "Protection of subscriber privacy rights."  By title, it is thus addressed broadly to the harms experienced by telephone subscribers, rather than to the forms of technology used to inflict such harms (*e.g.*, an ATDS or prerecorded voice).  And the broad sweep of § 227(c)'s title is entirely consistent with its operative text.  *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (heading cannot override plain meaning of statute).  Section 227(c) directed the FCC to conduct a rulemaking proceeding to protect subscriber privacy rights by preventing unwanted "telephone solicitations," *id.* § 227(c)(1)–(2), which another provision of the TCPA defines

14

throughout § 227 as "telephone call[s] *or message[s]*" to encourage a commercial transaction, *id.* § 227(a)(4) (emphasis added). That prompted the FCC to create what has become the DNCR, *see id.* § 227(c)(3), and to issue regulations that prohibit "telephone solicitation[s]" to residential numbers listed on that database, *id.* § 227(c)(3)(F). Section 227(c)(5) also created a private right of action for receiving more than one "telephone call" within 12 months by the same entity in violation of the regulations prescribed under § 227(c). In sum, unlike § 227(b), which focuses on the automated equipment used in telemarketing campaigns, § 227(c) created a comprehensive regulatory scheme to combat the telemarketing—automated or not—that Congress had found to constitute an "intrusive invasion of privacy." *Mims*, 565 U.S. at 372 (quoting Pub. L. No. 102-243 § 2(5)).

The statute's text and context thus show that Congress, in enacting § 227(c), was focused on protecting subscribers from telephone solicitations, not on any one form of such solicitations. *See, e.g.*, *MEDVIDI*, 2025 WL 2856295, at *3; *Abboud v. Circle K Stores Inc.*, 731 F. Supp. 3d 1094, 1102 (D. Ariz. 2024). Given the weight of authority that § 227(b) covers text messages despite its narrower scope as to modes of technology than § 227(c), it logically follows that § 227(c) also covers text messages. Limiting § 227(c)'s reach to telephone voice calls while § 227(b) covers voice as well as text messages would create an irrational asymmetry at odds with the statute's text and structure. It would also be at odds with the Second Circuit's recognition that "the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA." *Melito*, 923 F.3d at 88.

### c.    *FCC Regulations Implementing the TCPA*

The FCC's regulations implementing the TCPA further support that § 227(c) applies to text messages. *See Loper Bright*, 603 U.S. at 402 ("[An agency's] expertise has always been one

of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

The FCC has long recognized that the TCPA's protections extend to technologies that did not exist when it was enacted.  *See, e.g.*, *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14017 (2003) ("2003 Order") ("significant changes in the technologies and methods used to contact consumers . . . warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA").  As early as 2003, it issued an order affirming that § 227(b) covered "*any call* . . . encompass[ing] both voice calls and text calls . . . including, for example, short message service (SMS) calls."  *Id.* at 14115 (emphasis in original).

The FCC has also issued regulations and guidance interpreting § 227(c) to cover text messages.  In January 2024, it issued a final rule codifying that the DNCR's protections under § 227(c) "extend to text messages."  *Targeting and Eliminating Unlawful Text Messages, Implementation of the Tel. Consumer Prot. Act of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 Fed. Reg. 5098, 5098–99, 5101 (Jan. 26, 2024); *see also In the Matter of Emanuel Manny Hernandez; Click Cash Mktg., LLC; & Rock Solid Traffic*, No. DA18-1291, 2018 WL 6830220, at *1, 4 (F.C.C. Dec. 21, 2018) (finding § 227(c) violation for sending telemarketing text messages to DNCR-listed numbers).  And, effective March 26, 2024, the FCC amended the regulations for both § 227(b) and (c) to apply unequivocally to "any person or entity making telephone solicitations or telemarketing calls *or text messages*."  47 C.F.R. § 64.1200(e) (emphasis added).

The FCC's consistent interpretation that the TCPA applies to text messages accords, as noted, with the statute's text, purpose, and context, and is informed by the agency's subject

matter expertise.  Its interpretation thus adds persuasive support that Congress intended § 227(c)
to cover text messages.  *See, e.g.*, *Mujahid*, 2025 WL 3140725, at *3; *Wilson v. Skopos Fin.,
LLC*, No. 25 Civ. 376, 2025 WL 2029274, at *4 (D. Or. July 21, 2025); *Hudson v. Palm Beach
Tan, Inc.*, No. 23 Civ. 486, 2024 WL 4190513, at *8 (M.D.N.C. Aug. 12, 2024), *report and
recommendation adopted*, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024); *Pariseau*, 619 F.
Supp. 3d at 1206–07.

Better Mortgage argues that *Loper Bright*'s overruling of *Chevron* deference to
reasonable agency interpretations means that § 227(c) does not cover text messages.  That is
wrong.  Consistent with *Loper Bright*, the Court has exercised its "independent judgment" in
finding that the text, purpose, and context of § 227(c) indicate that the provision applies to text
messages.  *Loper Bright*, 603 U.S. at 394.  That conclusion is supported—not dictated—by the
FCC's identical interpretation, which "constitute[s] a body of experience and informed judgment
to which courts . . . may properly resort for guidance."  *Id.* (quoting *Skidmore*, 323 U.S. at 140).

### d.      *Case Law Interpreting § 227(c)*

District court decisions have largely held that § 227(c) applies to text messages.  *See, e.g.*,
*Mujahid*, 2025 WL 3140725, at *3; *MEDVIDI*, 2025 WL 2856295, at *2–4; *Skopos Fin.*, 2025
WL 2029274, at *4–5; *Hudson*, 2024 WL 4190513, at *8; *Pariseau*, 619 F. Supp. 3d at 1207;
*Sagar v. Kelly Auto. Grp., Inc.*, No. 21 Civ. 10540, 2021 WL 5567408, at *4–5 (D. Mass.
Nov. 29, 2021); *see also Bosley v. A Bradley Hosp. LLC*, No. 25 Civ. 22336, 2025 WL 2686984,
at *5 (S.D. Fla. Sept. 19, 2025) (no dispute that § 227(c) applies to text messages); *Evers v.
CampaignSidekick, LLC*, 2025 WL 2896818, at *4 (N.D. Ill. Oct. 10, 2025) (same); *Connor v.
Servicequick Inc.*, No. 24 Civ. 2286, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) (same).

17

These decisions turned on statutory construction, not agency deference, and thus are not called into question by *Loper Bright*.

Better Mortgage relies on three district court decisions from outside this Circuit holding the opposite. The reasoning in those decisions, however, was flawed. All placed significant weight on the facts that (1) a speaker today would likely not refer to a text message as a "call," and (2) text messages did not exist when the TCPA was enacted. *See Davis v. CVS Pharmacy, Inc.*, No. 24 Civ. 477, 2025 WL 2491195, at *1 (N.D. Fla. Aug. 26, 2025) ("[n]o normal person refers to a text message, or thinks of a text message, as a 'call'"); *Jones v. Blackstone Med. Servs., LLC*, 792 F. Supp. 3d 894, 899–900 (C.D. Ill. 2025) (similar); *Sayed v. Naturopathica Holistic Health, Inc.*, No. 25 Civ. 847, 2025 WL 2997759, at *2 (M.D. Fla. Oct. 24, 2025) (similar).[10] For the reasons reviewed above, those arguments are unpersuasive.

### e.   Overall Assessment

As reviewed above, the ordinary public meaning of "telephone call" in § 227(c) meant a communication by telephone, which encompasses text messages. That reading is supported by § 227(c)'s context and purpose; the uniform construction of neighboring § 227(b); the significant

---

[10] The district court in *Sayed* also noted that because Congress used the term "text message" elsewhere in the TCPA, it drafted § 227(c) with the distinction between the terms "text message" and "telephone call" in mind. 2025 WL 2997759, at *2 (citing 47 U.S.C. § 227(e)(8)(A)–(B)). That conclusion is unpersuasive. The term "text message" was not in the original statute. It was added to § 227(e) in 2019, when Congress passed, and the President signed, the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (the "TRACED Act"). *See* Pub. L. No. 116-105, 133 Stat 3274 (December 30, 2019). That act primarily amended § 227(e), which relates to caller identification requirements, including by adding the term "text message" to that provision's prohibition on inaccurate caller identification information, and defining the term for purposes of "*this subsection*," *i.e.*, § 227(e). *Id.* at 3284 (emphasis added). Congress's use of the term "text message" in amending § 227(e) in 2019 does not bear on the scope of the term "telephone call" in § 227(c), which was fixed in 1991. *See Loper Bright*, 603 U.S. at 400 ("[E]very statute's meaning is fixed at the time of enactment.").

weight of case authority; and the FCC's consistent interpretation.  The Court therefore holds that § 227(c) applies to text messages.

### 4. Whether the AC Adequately Pleads Receiving "Telephone Solicitations" Under Section 227(c)

Better Mortgage next argues that the AC does not plead facts to support that Wilson received prohibited "telephone solicitations" within the meaning of § 227(c).

The regulations implementing § 227(c) define "telephone solicitation" as the "initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 U.S.C. § 64.1200(f)(15).  That term does not include a call or message (1) to a person who has given prior express consent; (2) to a person with whom the entity initiating the communication has an established business relationship; or (3) initiated by a tax-exempt nonprofit organization.  *Id.* § 64.1200(f)(15)(i)–(iii).

A complaint adequately pleads a TCPA claim based on a "telephone solicitation" where it alleges that a call or message references a nonexistent commercial relationship between the sender and recipient.  Such supports the inference that the reference was pretextual, aimed at inducing the recipient to engage the sender's services.  In *Wilson v. Skopos Financial, LLC*, for example, the plaintiff received text messages to his DNCR-listed number from an auto-loan provider addressed to an unknown "Brian," which was not the plaintiff's name.  2025 WL 2029274, at *1.[11]  These stated that "Brian" had started a car loan application with the lender, and requested that "Brian" complete the application.  *Id.*  In fact, the plaintiff alleged, he had never interacted with the lender before, let alone submitted a loan application.  *Id.*  The

---

[11] The plaintiff in *Skopos Financial* has the same full name as plaintiff Wilson, and appears to be the same party.

district court denied the lender's motion to dismiss.  *Id.* at *2–3.  With no preexisting relationship between the plaintiff and the lender, the court reasoned, the "natural inference" was that the lender had "pretextually" sent the text messages referencing a loan application to promote its loan services to plaintiff.  *Id.*  Plaintiff thus had plausibly alleged that the text messages were "telephone solicitations" to state a claim under § 227(c).

Similarly, in *Whittaker v. Freeway Insurance Services America, LLC*, the plaintiff received voicemails to her DNCR-listed number from a car insurance company.  These purported to follow up on a request for an insurance quote, and asked plaintiff to call back for additional information about the company's money-saving insurance products.  No. 22 Civ. 8042, 2023 WL 167040, at *1–2 (D. Ariz. Jan. 12, 2023).  The district court denied the motion to dismiss. *Id.*  It stated that it was "hard to imagine" a reason why an insurance company would contact a person not insured by it and state that the recipient stood to save money by calling back, other than to solicit the purchase of its services.  *Id.*

Here, the AC likewise alleges facts sufficient to support an inference that Better Mortgage sent Wilson text messages for the purpose of encouraging him to apply for a home loan from the lender.  As alleged, Wilson never applied for a mortgage (or any other) loan with Better Mortgage, nor requested any information from it.  AC ¶¶ 31, 46.  He nonetheless received a text message from Better Mortgage—ostensibly addressed to an unknown "Joseph" —that prompted the recipient "to provide information on [his] assets" because he was "only a few steps away from getting pre-approved" for a home loan with Better Mortgage.  *Id.* ¶ 18.  It included Better Mortgage's unique NMLS identifier, signaling that the text message was commercial in purpose.  *Id.* ¶¶ 21–25.  The second text message—received two days later, again addressed to "Joseph"—congratulated the recipient on pre-approval for a home loan.  *Id.* ¶ 18.  It requested a

phone call "to discuss the recent [home loan] application and to learn more about your home buying journey." *Id.*

These allegations easily support the inference that Better Mortgage referenced another person's ostensibly successful home loan application as a pretext—with the goal of inducing Wilson to engage with, and apply for a home loan from, the lender. Both text messages were commercial in nature: they discussed the process of applying for a home loan with Better Mortgage (and included the lender's NMLS identifier). The content of both messages support that they were designed to convey that Better Mortgage's pre-approval process was quick and easy. The first stated that the ostensible applicant was "only a few steps away" from pre-approval; the second, sent two days later, congratulated the applicant on pre-approval for a home loan. That Wilson had never applied for a loan with or sought information from Better Mortgage supports that the references in the text messages to a pending home loan application were pretextual and intended to prompt Wilson to engage with Better Mortgage.

Better Mortgage's counterarguments are unpersuasive. First, it argues that its text messages did not encourage Wilson to purchase its services because they merely requested information. That is wrong. The information requested related to the prospective customer's "assets" and "home buying journey," for use in a home loan application. The text messages thus solicited the purchase of a specific service: a home loan with Better Mortgage. And the cases Better Mortgage cites are far afield. *See, e.g., Aderhold v. Car2go N.A., LLC*, No. 13 Civ. 489, 2014 WL 794802, at *1, 8–9 (W.D. Wash. Feb. 27, 2014), *aff'd*, 668 F. App'x 795 (9th Cir. 2016) (plaintiff consented to receive text message containing security code for online registration that plaintiff had begun); *Eldridge v. Pet Supermarket Inc.*, 446 F. Supp. 3d 1063,

1068 (S.D. Fla. 2020) (no solicitation where text messages confirmed plaintiff's voluntary registration in raffle).

Second, Better Mortgage argues that the text messages were not solicitations because they were ostensibly directed to a person other than Wilson (*i.e.*, "Joseph"). MTD at 21–23. That fact, however, supports that the text messages were solicitations directed to Wilson. Had they been addressed to Wilson, he would have been less likely to engage with Better Mortgage, as he would have recognized the falsity of their claim that he had applied for a home loan. As the AC plausibly alleges, by addressing the text messages to a generic first name, Better Mortgage communicated that it was quickly pre-approving home loans to applicants who had taken "only a few steps." AC ¶ 18.

The AC thus plausibly pleads that the text messages, read together, were "telephone solicitations" within the meaning of § 227(c). *See, e.g.*, *Skopos Financial*, 2025 WL 2029274, at *2–3; *Whittaker*, 2023 WL 167040, at *1–2; *see also Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) ("common sense" dictated that robocalls urging plaintiff to redeem rewards points, which required purchasing defendant's products, were solicitations).

### 5.    Whether Wilson's Prayer for Treble Damages Should be Dismissed

Better Mortgage also moves under Rule 12(b)(6) to dismiss the AC's prayer for treble damages. Under the TCPA, a court "may, in its discretion," award treble damages to the plaintiff if the court finds that the defendant "willfully or knowingly" violated § 227(c). 47 U.S.C. § 227(c)(5). Better Mortgage asserts that the AC does not allege facts supporting that the lender willfully or knowingly violated the TCPA. MTD at 23–24.

The Court denies this request as procedurally premature. *See Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 284 (S.D.N.Y. 2024) (Engelmayer, J.) (denying motion to

dismiss prayer for treble damages under TCPA for same reason); *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 536 (S.D.N.Y. 2013) (same as to punitive damages available under different statute).  Motions to dismiss are ordinarily not properly directed at species of damages, save where such relief is categorically unavailable.  *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010).[12]  Treble damages are not an independent cause of action.  *See Hunter v. Palisades Acquisition XVI, LLC*, No. 16 Civ. 8779, 2017 WL 5513636, at *9 (S.D.N.Y. Nov. 16, 2017).  Whether the record can support such damages requires an as-yet undeveloped factual record.  *See, e.g.*, *Bottom Line Concepts*, 723 F. Supp. 3d at 284; *Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322, 353–54 (S.D.N.Y. 2023) (denying motion to strike prayer for punitive damages where such damages were not categorically unavailable); *Denton v. McKee*, 332 F. Supp. 2d 659, 667 (S.D.N.Y. 2004) (denying motion to dismiss as premature, to the extent it sought to preclude certain categories of damages).

### B.    Better Mortgage's Motion to Strike the AC's Class Allegations Under Rules 12(f) and 23

Better Mortgage next moves to strike the AC's allegations related to class-wide relief.  It argues that questions of law and fact do not predominate over the putative class because the AC's claims require individualized inquiries—specifically, whether putative class members (1) consented to receive text messages from Better Mortgage; (2) qualify as residential

---

[12] Motions to dismiss may be directed to prayers for relief where certain damages are unavailable as a matter of law.  *Doe v. Indyke*, 457 F. Supp. 3d 278, 283–85 (S.D.N.Y. 2020) (Engelmayer, J.) (collecting cases and noting that such motions have alternatively been framed and granted as motions to strike under Rule 12(f)).  Here, the TCPA authorizes treble damages.  47 U.S.C. § 227(c)(5).

subscribers; (3) listed their phone numbers on the DNCR; and (4) received text messages that were telephone solicitations.  MTD at 24–28.

The Court denies this motion, too, as procedurally premature.

Under Rule 23, a court must determine whether to certify a class at an "early practicable time after a person sues . . . as a class representative."  Fed. R. Civ. P. 23(c)(1)(A).  A party may move to strike class claims before discovery if such "would not mirror the class certification inquiry and if resolution of the motion is clear."  *Davito v. AmTrust Bank*, 743 F. Supp. 2d 114, 115–16 (E.D.N.Y. 2010) (collecting cases); *see also Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 6 Civ. 6198, 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008).  But, absent those circumstances, motions to strike class claims are strongly disfavored because class certification under Rule 23 typically requires "a more complete factual record."  *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012); *see, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012).

Better Mortgage's fact-intensive arguments for striking the class allegations in the AC underscore why its motion is premature.  There is not yet a factual record that would enable the Court to assess whether Rule 23's requirements are met.  As Better Mortgage acknowledges, that may very well depend on facts to be developed relating to putative class members, including the nature of the text messages they received from Better Mortgage; whether they used their cellphone numbers for personal purposes; whether and when they listed their numbers on the DNCR; and whether they had consented to receiving text messages from Better Mortgage.  Better Mortgage's motion is properly made later, following class discovery.  *See Davito*, 743 F. Supp. 2d at 115–16 (motion to strike class claims before discovery proper only if it does not

mirror class certification inquiry). Notably, its present motion almost exclusively cites cases arising at that later stage, not on a pre-discovery motion to strike. *See* MTD at 24–28.

The Court therefore denies as premature the motion to strike the AC's class allegations. *See, e.g.*, *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464–65 (S.D.N.Y. 2013) (denying motion to strike class claims because such required factual development); *Chen-Oster*, 877 F. Supp. 2d at 117–18 (same).

## CONCLUSION

For the above reasons, the Court denies Better Mortgage's motion to dismiss the AC and to strike the AC's class allegations.

This case will now move to discovery. The Court directs counsel to revise the case management plan that the parties previously proposed, Dkt. 26, to provide expressly for class discovery. The revised case management plan is due December 10, 2025. Provided that this plan is otherwise consistent with the previously proposed plan, the Court expects to approve it and will do so by separate order.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 17.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: December 5, 2025
New York, New York

25